**THE STATE OF SOUTH CAROLINA**
**In The Supreme Court**

Jarvis Gibbs, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2014-000447

---

## ON WRIT OF CERTIORARI

---

Appeal From Kershaw County
James R. Barber, III, Circuit Court Judge

---

Opinion No. 27630
Submitted February 16, 2016 – Filed April 27, 2016

---

## AFFIRMED

---

Appellate Defender John H. Strom, of Columbia, for Petitioner.

Attorney General Alan M. Wilson and Assistant Attorney General Megan Harrigan Jameson, both of Columbia, for Respondent.

---

**JUSTICE BEATTY:** A jury convicted Jarvis Gibbs of kidnapping, entering a bank with the intent to steal, and using a firearm during the commission of a violent crime. The trial court sentenced Gibbs to an aggregate eighteen years' imprisonment. The Court of Appeals affirmed. *State v. Gibbs*, Op. No. 2011-UP-

511 (S.C. Ct. App. filed Nov. 28, 2011).  Gibbs subsequently filed an application for post-conviction relief ("PCR").  After a hearing, the PCR court dismissed his application with prejudice.  This Court granted Gibbs' petition for a writ of certiorari to review the PCR court's finding that trial counsel was not ineffective in failing to object to claims of witness intimidation.  We affirm.

## I.  Factual/Procedural History

On July 25, 2008, at approximately 10:55 a.m., an individual robbed the First Palmetto Savings Bank in Camden wearing gloves, a white t-shirt, and a ski mask.  Witnesses indicated the individual was a black male approximately six feet, four inches tall.  None of the witnesses were able to state with certainty whether the man had any noticeable scars or tattoos.[1]

Two individuals observed the man fleeing the bank on a bicycle.  At this time, one of the individuals also noticed a four-wheeler in the vicinity of the bank.  Shortly thereafter, the police found a bicycle on the side of a dirt road located in the general direction in which the man fled.  Next to the bicycle were tracks left by a four-wheeler.  The police seized the bicycle.

That afternoon, Arthur Macklin saw the bicycle in the trunk of a passing police car.  Macklin, believing it was the same bicycle he loaned Gibbs, contacted his attorney who subsequently contacted the police.  Macklin informed the police that he loaned Gibbs the bicycle earlier that day.  He also told police that a local resident named James Drakeford drove past his house on a four-wheeler that morning.[2]

At approximately 5:00 p.m. that afternoon, police picked Gibbs up for questioning.[3]  In his video statement to the police, Gibbs denied robbing the bank. Gibbs said that morning he woke up and took a shower at a friend's house at 10:30

---

[1] Due to the quality of the bank's video surveillance, the police were also unable to determine whether the man had any tattoos or scars.

[2] Drakeford was subsequently charged with conspiracy to commit kidnapping and entering a bank with intent to steal.

[3] Gibbs is six feet, three inches tall and weighs 220 pounds.  At the time of the robbery, he also had tattoos and scars on his forearms.

or 11:00 a.m.  After taking a shower, Gibbs stated he headed to the Dusty Bend area of Camden to get a haircut at "11:00, 12:30, 1:30."  At one point, Gibbs stated *after* his haircut, he went to Macklin's to borrow a bicycle for twenty minutes.  At another, Gibbs stated he borrowed the bicycle *before* the haircut.  Gibbs then provided two different versions about returning the bicycle.  In one version, Gibbs dropped it off by Macklin's fence.  In another, he gave the bicycle back in-person.  In both versions, he borrowed the bicycle after 11:30 a.m.  Gibbs was subsequently charged with kidnapping, entering a bank with the intent to steal, and using a firearm during the commission of a violent crime.

At trial, the State called Melissa Roberts, an employee of First Palmetto Savings Bank who was working at the time of the robbery.  Roberts testified she knew Gibbs because they went to the same school together for one or two years approximately fifteen years before the robbery.  She also said she saw Gibbs about five years before the robbery at her mother-in-law's store.  In addition, Roberts testified that before the bank robbery she had seen Gibbs in the bank standing around, which she thought was strange because she did not believe he had a relationship with the bank.[4]

Roberts testified that after reviewing the video surveillance of the robbery, but before the police provided the bank with a suspect, she told the police she believed Gibbs was the individual who robbed the bank.  Roberts based her belief on Gibbs' "mannerisms and the shape of his body" and the fact that he had been in the bank prior to the robbery.  On cross-examination, however, Roberts conceded that, at the time she identified Gibbs from the video surveillance, she knew Gibbs had already been arrested.

Chad Moore also testified for the State.  Moore, who was also being held in the Kershaw County Detention Center at the same time as Gibbs, testified that Gibbs confessed to robbing the bank.  Specifically, Moore testified that Gibbs told him:  (1) Gibbs rode a bicycle to the bank; (2) he robbed the bank wearing a toboggan hat, a white t-shirt, blue jeans, and black sneakers; (3) after leaving the bank, he got on a four-wheeler with "Little James"; (4) Gibbs and "Little James"

---

[4]  Roberts never said how long it had been before the robbery when she saw Gibbs in the bank.  However, Leah Bailey, another bank employee, testified that, earlier in the week of the robbery, she also saw a man standing around the lobby, which she too thought was strange because he never completed a bank transaction.  Bailey, however, was unable to identify Gibbs as the individual.

ditched the four-wheeler by a pond in Dusty Bend; and (5) after ditching the four-wheeler, Gibbs went to get a haircut. According to Moore, the only thing Gibbs was worried about was someone noticing his scars and tattoos. On July 28, 2008, Moore relayed this information to the City of Camden Police Department. The next day, the police recovered the four-wheeler from a pond on Firetower Road in Dusty Bend.

Macklin was also called to testify. According to Macklin, Gibbs borrowed one of his bicycles on the morning of the bank robbery. Ten to twenty minutes later, Macklin said he noticed police cars riding in the neighborhood. Later that morning, he recognized the bicycle he loaned Gibbs in a passing police car. The State then showed Macklin a picture of the bicycle and asked Macklin whether the picture was of his bicycle. Macklin replied "That's my bike." Shortly thereafter, Macklin's testimony concerning the bicycle wavered. The following exchange occurred:

Q. Is this your bike right here?

A. Like I told Lieutenant -- Detective Boan, that looks like my bicycle. I don't recall the coil being around the seat. And I thought that my bike had rubber things where the shocks are on the front.

. . .

Q. Do you agree that this is the same bike as in the picture?

A. I'm quite sure that is the same bike in the picture.

Q. Okay. And your bike was the one that was in the back of the patrol car?

A. Yes, it was.

Q. And you identified this as your bike in the picture?

A. Yes.

Q. So this is your bike?

A. It has got to be.

Q. So this is the bike that Jarvis Gibbs borrowed from you?

A. Excuse me?

Q. Is this the bike that Jarvis Gibbs borrowed from you?

A. As I said, I know my bicycle, but I don't recall the things that -- that coil on the seat.

Q. Okay.

A. And I thought my bicycle had the rubber things on the shock part.

Q. Okay. But this is your bike right here, right?

A. That appears to be my bicycle.

Q. And that bicycle is the one that Jarvis borrowed from you?

A. I assume that it is.

Once the State established that the bicycle was the same one Macklin loaned Gibbs, the State questioned Macklin about what happened to him after he talked with the police. Macklin testified "some guys jumped on [him] and knocked [him] out and they were supposed to shoot [him] and kill [him] while [he] was on the ground." The following exchange occurred:

A. It was put in the paper what -- the owner of the bicycle said what happened.

Q. Yes.

A. And that might as well say I said what happened.

Q. Yes, uh-huh.

A. And I asked that whatever I said be confidently kept.

Q. Uh-huh.

A.      But they put it in the paper, and I got hurt behind that.

Q.      And you got assaulted because of that?

A.      Yes, sir.

. . .

Q.      Do you know the name -- do you know who did that to you?

A.      I don't know my assailant.

. . .

Q.      You didn't want to come [today], did you?

A.      No, sir.  I'm afraid for my life.

When the State asked about whether Macklin saw an individual riding a four-wheeler that morning, the following exchange occurred:

Q.      Okay.  Did you give the police a name as to who was on the 4-wheeler?

A.      Yes, sir, I did.

Q.      And what name was that?

A.      I told them James Drakeford.

Q.      Okay.  Now, you got beat up, right?

A.      Yes, I did.

On cross-examination, trial counsel asked Macklin if he was sure the bicycle in the picture was the same bicycle he loaned Gibbs the day of the robbery. Macklin said he was not sure.  Trial counsel then asked Macklin if "Gibbs ever threatened to hurt [him] in any way?"  Macklin responded "No way at all."  On re-cross, trial counsel asked if Macklin had seen Gibbs after the robbery.  Macklin

said "Yes." Trial counsel then asked if Gibbs had said anything to him. Macklin responded "not one thing."

After the State presented its case, trial counsel called Gibbs to the stand. Gibbs testified that on the morning of the robbery, he stopped by his "home boy house" at around 8:45 a.m. Thereafter, Gibbs stated he went to see Macklin to borrow a bicycle. Ten to fifteen minutes after borrowing the bicycle, at approximately 10:00 a.m., Gibbs testified he placed the bicycle on Macklin's fence and then walked to the barber shop. Gibbs said he was in the barber shop for approximately one hour and that it was around 10:00 a.m. or 11:00 a.m. when he left. After leaving the shop, Gibbs went to rest in Boykin Park, where the police later found and arrested him.[5]

On cross-examination, Gibbs testified he found out about the robbery while he was still at the barber shop because people were coming in the shop talking about it. The State then asked Gibbs how he could have found out about the robbery if it happened at 10:55 a.m. and he left the barber shop at 10:00 or 11:00 a.m. The State then played portions of his video statement to impeach Gibbs' trial testimony from the substantially different statement Gibbs provided the police on the day of the robbery.

During its closing argument, the State made the following comments, which Gibbs takes issue with on appeal:

You know, [Macklin] actually tried to take the Fifth up here on a couple of questions. You know, he did not want to be here. Once we got done with him, you know, he essentially told the same thing to you that he told to [the detective] back on July 25th, 2008. **And what happened because he talked to [the detective] and told him the story? He got beat up. He got knocked out. He said his whole face was swole up. He didn't want to be here. He didn't want to get beat up again. He didn't want to get hurt. He didn't [want] to get killed.**

But guess what? He was here. He told the same story. He even said that -- if you remember, I asked him, when I asked him if he wanted to be here, do you remember when he said the Sheriff's

---

[5] Gibbs also denied ever being in the bank or in Roberts' mother-in-law's store.

Department finally caught up with him to serve him that subpoena to be here? 1:30 Monday morning. You know, he was trying not to get up there.

The jury subsequently convicted Gibbs of kidnapping, entering a bank with the intent to steal, and using a firearm during the commission of a violent crime. The trial judge sentenced Gibbs to an aggregate eighteen years' imprisonment. The Court of Appeals affirmed. *State v. Gibbs*, Op. No. 2011-UP-511 (S.C. Ct. App. filed Nov. 28, 2011). Gibbs subsequently filed an application for PCR in which he raised fifteen allegations of ineffective assistance of trial counsel, including:

a. Trial counsel was . . . ineffective for failing to object to a line of testimony in which a key witness for the prosecution, Arthur Macklin, was allowed to testify that he had been threatened and physically assaulted as a consequence of his cooperation with the Applicant's prosecution thereby improperly bolstering the witnesses' credibility and attacking the Applicant's character where there was not [sic] evidence connecting the Applicant to the behavior in question.

b. Trial counsel was ineffective for neglecting to object to an improper and highly inflammatory closing argument in which the State emphasized threats to witness Macklin where there was no evidence tying the Applicant to any such activity.

At the hearing, trial counsel explained that he did not object to the testimony or to the closing argument because he believed Macklin lacked credibility based on his disposition at trial and because it is well-known in the area that Macklin is a crack-addict. Trial counsel further testified that he did not object because Macklin admitted Gibbs did not attack or threaten him in any way. The PCR court dismissed Gibbs' application with prejudice, concluding, *inter alia*, Gibbs was not prejudiced by any of trial counsel's alleged deficiencies. Gibbs appealed.

This Court granted Gibbs' petition for a writ of certiorari to review the PCR court's finding that trial counsel was not ineffective in failing to object to claims of witness intimidation.

## II.     Standard of Review

"This Court gives great deference to the PCR court's findings of fact and conclusions of law." *Caprood v. State*, 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000).  If there is *any* evidence of probative value to support the PCR court's decision, this Court will uphold the decision unless it is controlled by an error of law. *Suber v. State*, 371 S.C. 554, 558, 640 S.E.2d 884, 886 (2007).

## III.     Discussion

Gibbs asserts his Sixth Amendment rights were violated when trial counsel failed to object to claims of witness intimidation.  We agree, however, for reasons discussed below, we find Gibbs was not prejudiced by the violation.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984); *Lomax v. State*, 379 S.C. 93, 665 S.E.2d 164 (2008).  To overcome the presumption that counsel has rendered adequate assistance, the defendant must show:  (1) counsel's performance was deficient, falling below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  However, "no prejudice occurs, despite trial counsel's deficient performance, where there is otherwise overwhelming evidence of the defendant's guilt." *Smith v. State*, 386 S.C. 562, 566, 689 S.E.2d 629, 631 (2010) (citing *Rosemond v. Catoe*, 383 S.C. 320, 325, 680 S.E.2d 5, 8 (2009)).

### A. Deficient Performance

Gibbs argues trial counsel's failure to object to both Macklin's testimony and portions of the State's closing argument was deficient because it allowed the State to imply, without supporting evidence, that Gibbs intimidated Macklin in an effort to prevent him from testifying.  We agree.

In *State v. Edwards*, this Court held that "witness intimidation evidence, *if linked to the defendant*, may be admitted to show a consciousness of guilt." 383 S.C. 66, 72, 678 S.E.2d 405, 408 (2009) (emphasis added).  Here, there is no evidence linking Gibbs to the attack on Macklin.  Accordingly, the testimony and

the solicitor's closing statements concerning the attack should not have been admitted. *See Mincey v. State*, 314 S.C. 355, 358, 444 S.E.2d 510, 511-12 (1994) (finding impermissible the admission of the solicitor's closing statements concerning witness intimidation when there was no evidence the defendant intimidated the witness).

## B. Prejudice

While we find trial counsel was deficient for failing to object, we nevertheless affirm the PCR court's decision because there is evidence to support its finding that Gibbs was not prejudiced by trial counsel's deficiencies.[6]

Here, there is overwhelming evidence of Gibbs' guilt. Witnesses testified the robber was approximately six feet, four inches tall. Gibbs is six feet, three inches tall. A bank employee, Melissa Roberts, testified she saw Gibbs standing around inside the bank prior to the robbery. Macklin testified that, shortly before the bank robbery, he loaned Gibbs the bicycle that was used in the getaway. Macklin also said he saw James Drakeford on a four-wheeler that morning. Another individual testified that he saw a four-wheeler in the vicinity of the bank at the time of the robbery. Moore testified Gibbs told him he committed the robbery with the assistance of an individual on a four-wheeler nicknamed "Little James." In addition to corroborating the testimony of other witnesses, Moore was able to provide the police with additional information, which he obtained from Gibbs, and which ultimately led to the discovery of the four-wheeler.

Finally, there is Gibbs' testimony. Gibbs' statement from the day of the robbery contained a number of inconsistencies regarding where he was that day, when he was there, and what he was doing. Further, at trial, Gibbs told a substantially different story than those in his statements to the police. Also, at one point in his trial testimony, Gibbs unwittingly stated: "I mean, it just so happened the bicycle that I happened to rode got used to rob a bank, but I didn't rob no bank, you know what I'm saying."

---

[6] *See Brown v. State*, 383 S.C. 506, 517, 680 S.E.2d 909, 915 (2009) (finding that, while trial counsel's failure to object to the solicitor's closing statement asking the jury "to speak up for the victim" constituted deficient performance, there was not a reasonable probability that, despite trial counsel's deficiencies, the outcome would have been different).

Based on the evidence presented by the State and Gibbs' contradictory testimony, we agree with the PCR court that Gibbs was not prejudiced by trial counsel's deficient performance as there is overwhelming evidence of Gibbs' guilt.

## IV. Conclusion

In conclusion, we find trial counsel was deficient for failing to object to the testimony and closing statements concerning witness intimidation. However, Gibbs was not prejudiced by trial counsel's deficiencies. Accordingly, the decision of the PCR court is

**AFFIRMED.**

**PLEICONES, C.J., KITTREDGE, and HEARN, JJ., concur. FEW, J., not participating.**